**STANDARD STOKER CO., Inc., v. BERKLEY MACH. WORKS & FOUNDRY CO., Inc.**

Nos. 233–235.

District Court, E. D. Virginia, Norfolk Division.

Oct. 26, 1938.

Leigh D. Williams (of Williams, Loyall & Taylor), of Norfolk, Va., and C. V. Edwards (of Edwards, Bower & Pool), of New York City, for plaintiff.

Roland Thorp, of Norfolk, Va., and Jo. Baily Brown (of Brown, Critchlow & Flick), of Pittsburgh, Pa., for defendant.

WAY, District Judge.

The above numbered suits have by consent been heard and considered together. The suits were instituted in July, 1931, but allowed by the parties to remain dormant on the docket until the Court on its own motion ordered that they be tried or dismissed. Plaintiff charges defendant with the infringement of five patents of which plaintiff is the sole owner, having acquired the patents and all rights therein through valid assignments. The patents are:

(1) Lower patent No. 1,373,748, relating to locomotive stokers. This patent was granted April 5, 1921, to an assignee of Nathan M. Lower, the inventor, and may be referred to as the *"Big End Conveyor Screw"* patent.

(2) Hunt patent No. 1,690,116. Application for this was filed by Andrew M. Hunt, January 27, 1925. The patent was granted November 6, 1928, to an assignee of said Hunt, and may be described as the *"Double Thread Conveyor Screw"* patent.

(3) Hunt, No. 1,724,593. Application for this patent was filed by Andrew M. Hunt, January 27, 1925, the patent was granted to an assignee of Hunt on the 13th day of August, 1929, and will be referred to as the *"Notch Conveyor Screw"* patent.

(4) Lower, No. 1,455,058. Application for which was filed by said Nathan M. Lower on August 8, 1918. The patent was granted May 15, 1923, to an assignee of Lower. It relates to mechanism for the distribution of fuel coal in the locomotive fire box and for convenience will be referred to as the *"One Piece Distributor"* patent.

(5) Lower and Chalker, No. 1,642,076. Application for that patent was filed by Lower and Chalker March 13, 1922. The patent was granted September 13, 1927. All rights therein were subsequently acquired by plaintiff. This patent will be

called the *"Three Piece Distributor"* patent.

To summarize, Patents Lower No. 1,373,748, and Hunt Nos. 1,690,116 and 1,724,593, relate to the means of conveying coal from the locomotive tender or fuel bin to the fire box, and patents, Lower No. 1,455,058 and Lower and Chalker No. 1,642,076, relate to the means of distributing the coal in the fire box of the locomotive.

The three conveyor screw patents relating to the means of conveying coal from the tender to the fire box as granted, except claim 14 of Hunt No. 1,724,593, combine the horizontal conveyor screw with numerous other parts not covered by said patents. With reference to the distributor patents, in patent No. 1,455,058, claims 1, 4 and 7 are of a patent per se, while claims 2, 3, 5, 6, 8 and 9 are combination claims. In No. 1,642,076 No. 11 is a combination claim.

The coal is conveyed by each type of conveyor screw in suit horizontally and forwardly from the locomotive tender or fuel bin where it settles by gravity into such trough through a metal trough or conduit to a transfer hopper into which the coal is discharged by the horizontal conveyor screw. From this hopper the coal is raised by two elevator screws which as they extend upwardly from the transfer hopper, generally diverge in V-shape. (See picture below.) At its upper end the elevator screw drops the coal onto a plate in a tube from which point the coal is blown forwardly by steam jets, which jets, in conjunction with other distributing means, distribute the coal both forwardly and laterally in the fire box of the locomotive.

Coal Distributor
Part No. 5814
5
Part No. 5812
Part No. 5908
6
Part No. 5601
8
Part No. 5902
Part No. 5909-A
7
Part No. 5926
10
Duplex Stoker Assembly

Horizontal Conveyor Screw
Part No. 5926
11
10
12

I. Lower Patent No. 1,373,748

The "Big End Conveyor Screw"

Only two claims are based on this patent, to-wit:

"1. In a locomotive stoker, in combination, a fuel-transferring screw having its final turn of greater radius than the remainder of its turns, and fuel elevating screw means receiving from the transferring screw.

"2. In a locomotive stoker, in combination, a conduit for transferring fuel from the tender of the locomotive, a receiving chamber on the locomotive into which the conduit discharges, a screw conveyor in the conduit, the delivery end of the screw being of greater carrying capacity than the remaining portion thereof, and fuel elevating screw means leading from the receiving chamber."

The single novel feature claimed and disclosed in each entire combination is the *enlarged final flight* in the horizontal conveyor screw. Picture below.

N. M. LOWER.
SCREW CONVEYER.
APPLICATION FILED FEB. 24, 1919.
1,373,748.
Patented Apr. 5, 1921.
Enlarged final flight -
Inventor:
Nathan M. Lower
Attys.

This enlarged final flight, it is claimed by plaintiff, causes greater pressure on the coal as it is forced into the hopper at the terminal end of the horizontal conveyor screw and thereby affords freer and more continuous movement of the coal as it is carried out of the hopper and upwardly by the elevator screws. These alleged advantages are thus described in Lower's application for the patent:

"The screw (10) carries the fuel forwardly in the trough as a somewhat loose mass. As the material reaches the more contracted portion of the trough where it joins the box 6, it is *taken up by the larger turn (11)* of the screw *and forced into the box with increased pressure*. This pressure assists the elevating screw by effectively reducing the frictional resistance of the fuel thereon and checking a tendency of the column of ascending material to merely rotate in the elevating conduit. This increased capacity of the last turn 11 of the transferring screw also prevents a retardation of the fuel at the delivery end of the conduit which, should it occur, would cause the material to pile up at the forward end of the trough and overflow its walls." (p. 1, lines 82–99 incl.)

The stoker known as the Duplex, has been a commercial success. There are about 7,000 Duplex stokers still in use although the Duplex type stoker has been largely superseded since 1930 by the type B Stoker, the horizontal conveyor screw in which is covered by other patents already referred to. However, the commercial success which the Duplex stoker has achieved is only in a measure due to the improvement made in the horizontal conveyor screw.

■ *Prior Art Patents:* Against the "Big End Conveyor Screw" covered by patent No. 1,373,748, a number of prior patents are cited.

Gard No. 255,385, granted March 21, 1882, was considered while the application for Lower No. 1,373,748 was pending. The Gard patent relates specifically to the brick making art. The Gard conveyor screw shows an enlarged final flight at its delivery end. Lower distinguished his conveyor screw from that of Gard on the ground that the Gard conveyor screw was devised and constructed for use in a non-analogous art. Undoubtedly the two arts as practiced are very dissimilar. But the similarity between the final flights in the Gard and Lower screws is striking, and, in each case, at least one purpose of the enlarged final flight as expressed by the patentee in his application, is to exert greater pressure on the material conveyed as it is deposited in the receiving hopper or other receptacle.

That the enlarged final flight was the only novel feature claimed by Lower is illustrated by the following statement in his application:

"It is common practice for the fuel to be transferred from the tender to the locomotive by means of a screw conveyor working in a trough and conduit located below the tender floor and delivering to a chambered body carried by the locomotive, from which it is elevated by one or more similar screws. It is important to the efficient working of the elevating screws that the fuel be under pressure as it is taken up and carried forward by them, thereby reducing the frictional action upon it of the vane of the elevating screw. It is, nevertheless, desirable that there be a free movement of the fuel in the horizontal or transferring conduit." (p. 1, lines 15-29)

There is very sound reason, I think, to regard a conveyor screw with an enlarged final flight, not narrowly as a screw to convey clay in one instance for brick-making, or coal for fuel purposes in another, but in a larger and more inclusive sense, as a *material conveying screw* whether it is employed to convey clay, coal, or other materials not used in either of said arts. Regarded in the broader sense there can be little doubt that Lower's conveyor screw, patent No. 1,373,748, was anticipated by the prior art as disclosed by Gard in patent No. 255,385 granted in 1882.

*Deacon No. 116,165.* Deacon's device is for feeding furnaces with fuel and was patented June 20, 1871. It shows an enlarged final flight on the horizontal screw G in Fig. 2 of the patent. In the Deacon patent (Fig. 2) the coal is fed into a trough (F) where the conveyor screw (G) is, which in turn advances and at the same time crushes the coal. The coal is fed forward onto a platform where it is brushed into the firebox by paddles b. With reference to the description of the Deacon screw, I quote from the patent p. 1, column 2:

"* * * turn a deeply cut screw or worm, G, nearly equal in diameter at the fan box end to the internal diameter of the cylinder, but tapering uniformly to a smaller diameter at the hopper end, that

portion of the screw directly beneath the hopper being merely a shaft with a very shallow thread."

It will be noted that Deacon's description, just quoted, refers to the locomotive tender as the "hopper". The patent goes on to show the purposes of the screw as follows:

(1) "Enables constant motion of fuel from hopper '(tender)' along cylinder and rendering quantity of fuel carried on during a given number of revolutions constant for different qualities of fuel."

(2) "To crush the coal."

The plaintiff maintains that this device shows no appreciation whatever of Lower's problem; that the enlarged flight was not created to put pressure against a body of coal being fed to an elevator screw, but to move fuel into rotating paddles which knock the coal into the fire box. But it is apparent, I think, that the purpose of Deacon's (progressively) enlarged flights was to put pressure on the fuel as it approached and reached the paddles which distributed the coal in the fire box. The real distinction between the two devices is not in the type of flights in the conveyor screw but in the means used to distribute the fuel in the fire box after it has passed beyond the horizontal conveyor screw. Both the principle and utility of the enlarged final flight or flights were disclosed by the Deacon patent.

*Martin No. 1,267,681.* This is a patent of a mechanical stoker for furnaces such as used in locomotive boilers. The stoker was patented May 28, 1918. Looking at Fig. 1 of the patent it appears that the stoker consists of a horizontal conveyor screw (35) which empties the coal into a hopper (36) and then into a conduit (12). The vertical conveyor screw (13) takes the coal upwardly and into a casing (5) which houses revolving disks which in turn knock the coal into the firebox.

This patented stoker differs from the one involved in patent No. 1,373,748, in that the horizontal conveyor screw (35) does not have the enlarged final flight or flights. This difference, the plaintiff maintains, would cause congestion of the coal in the hopper (36) which it claims is entirely avoided by patent Lower 1,373,748. It is also claimed that the flights (35) of the horizontal screw would be filled and packed. Another distinction is the method of distributing the coal by disks when it has been delivered by the elevator screw.

The patent does not anticipate Lower No. 1,373,748. However, it does illustrate the fact that conveying fuel from a locomotive tender by means of a horizontal screw forwardly to a hopper and thence upwardly by means of a vertical screw or screws, to a device which distributes it in the fire box, is an old art. The same observation may be made with respect to Williams patent, No. 1,142,293, a brief description of which immediately follows.

*Williams No. 1,142,293.* This patent was for improvement in an automatic stoker. It was issued on June 8th, 1915. The main object of the patent apparently was to provide a guard to withstand the terrific heat of the fire box and to promote proper distribution. However, the invention consisted of a grate, fuel conveying means and a guard. An explanation of the operation of the stoker is very aptly stated in the testimony (P. 218) as follows (referring to Fig. 1 of the Williams patent):

"This patent 1,142,293 shows a type of screw wherein the horizontal conveyor screw I is operating in the conduit G urging the coal forward by the camming action of the vanes of the screw, and delivering to a vertical conduit. Working in this vertical conduit is another ladder screw J which receives the coal from the horizontal conduit and forces it up to a level above the firebed where it is distributed over the firebed by the steam jet K."

The plaintiff contends that there is nothing there that functions in the manner of chamber 6 of the Lower patent 1,373,748: that it offers no means to avoid the congestion and packing of coal which occurs between those two screws. Some of these devices are still in use, but they are no longer made. They are similar to the early type stokers made by plaintiff, manufacture of which was discontinued due to the fact it is claimed that congestion was too great and was causing engine trouble. It does not anticipate No. 1,373,-748.

Hunt Patent No. 1,690,116

The "Double Thread Conveyor Screw".

■ As indicated in the preliminary statement, this patent relates to the conveyor screw in a mechanical stoker, particularly as used in locomotives. It contains five claims reading as follows:

"1. In a locomotive stoker, a forwardly extending conduit which terminates in

an elbow, a conveyor screw in said conduit and an upwardly extending unobstructed conduit adapted to receive coal from said first named conduit and deliver the same to the fire box, the conveyor screw being formed at its delivering end with a plurality of threads delivering the material in a generally axial direction at their ends so as to cooperate with said elbow to give a substantially continuous upward pressure on the material and cause a continuous advance of coal through said upwardly extending conduit.

"2. In a locomotive stoker, a forwardly extending conduit which terminates in an elbow, a conveyor screw in said conduit and an upwardly extending unobstructed conduit adapted to receive coal from said first named conduit and deliver the same to the fire box, the conveyor screw being formed at its delivering end for approximately an axial distance of three-quarters of a turn of the screw thread with a plurality of threads delivering the material in a generally axial direction at their ends so as to cause a continuous advance of coal through said upwardly extending conduit.

"3. In a locomotive stoker, a forwardly extending conduit which terminates in an elbow, a conveyor screw in said conduit and an upwardly extending unobstructed conduit adapted to receive coal from said first named conduit and deliver the same to the fire box, said conveyor screw being formed with a greater number of threads at its delivery end than the other portions delivering the materials in a generally axial direction at their ends so as to cooperate with said elbow to give a substantially continuous upward pressure on the material and cause a continuous advance of coal through said upwardly extending conduit.

"4. In a locomotive stoker, a forwardly extending conduit which terminates in an elbow, a conveyor screw in said conduit and an upwardly extending unobstructed conduit adapted to receive coal from said first named conduit and deliver the same to the fire box, said conveyor screw being formed with a double thread at its delivering end and a single thread at other portions so as to deliver the material in a generally axial direction at the end of the double threads and cooperate with said elbow to give substantially continuous upward pressure on the material and cause

a continuous advance of coal through said upwardly extending conduit.

"5. In a locomotive stoker, a forwardly extending conduit which terminates in an elbow, a conveyor screw in said conduit and an upwardly extending unobstructed conduit adapted to receive coal from said first named conduit and deliver the same to the fire box, said screw being formed with a double thread at its delivering end for an axial distance of approximately three-quarters of a turn of the thread and with a single thread at other portions, said double thread acting to deliver material in a generally axial direction at said elbow."

The sole new feature found or claimed in any of the five combinations set forth in the above quoted claims, is the extra or double thread shown in the attached illustration of the horizontal conveyor screw. See illustration on following page.

All of the other parts or members of a stoker embraced in each combination described in the different claims, namely, a forwardly extending conduit, an elbow, an upwardly extending conduit, and a fire box, are old in the art and no improvement or novel feature in any of those parts is disclosed or claimed. Each functions just as it did before this patent. This fact is well illustrated by the following language of Hunt in his application for the patent (p. 1, lines 5 to 26 inclusive) explaining the nature of the alleged invention:

"In conveyors of this type and particularly those wherein the coal is moved beyond the end of the screw conveyor upwardly through an unobstructed conduit to a point above the fire and is there distributed over the fire by steam jets, if the conveyor screw at its forward end has only a single thread or flight, the delivery of the coal from the mouth of the conduit is intermittent rather than continuous. The coal moves upward during a portion of each revolution of the screw and remains stationary during the remainder of the revolution. *Continuous delivery of coal to the fire box is desirable and the main object of the present invention is to provide means for effecting this result. For this purpose, I provide the conveyor screw at its forward or delivery end with a plurality of threads so positioned as to produce a continuous delivery of coal through the upwardly extending conduit.*" (Emphasis supplied)
(and same page, lines 63 to 75 inclusive)

"* * * While I have shown the screw conveyor as having a single thread with the additional thread 30 at its forward end only, it will be appreciated that the thread 30 may be continued through a greater portion of the screw. I find, however, that it is preferable to employ the additional thread at the forward end only and of a length of approximately ¾ of a turn of the thread. It is also obvious that, if desired, an additional number of threads may be employed at the forward end. Care should be taken, however, not to reduce the area of the passage so as to interfere with the movement of the coal."

Prior Art Patents Cited against No. 1,690,116

Numerous patents are cited by defendant in an effort to show that the double thread screw was a part of the art at the time the Hunt patent was granted. Some of these patents will be discussed briefly, although in the view that the court takes with respect to the validity of patents No. 1,373,748, 1,690,116 and claims 1 to 13, both inclusive, of Hunt patent No. 1,724,593, such discussion appears unnecessary for the purposes of this decision.

*Wiesbrock, No. 439,738.* This patent was issued November 4th, 1890. It does not, I think, disclose the improvement to a conveyor screw that is disclosed by Hunt in patent 1,690,116. It does not show a double flight at the delivery end as does the Hunt patent in suit. It does, however, as do a number of the other patents cited, tend to emphasize the age of the art and the means of conveying coal from a hopper or locomotive tender to a furnace by means of

screw conveyors, conduits, hopper and distributors, that is to say, that all of the members of a stoker were embodied in the art before the three conveyor patents in suit were ever granted.

*Neville, No. 804,160.* This patent was granted November 7, 1905, and was cited by the Patent Office against Hunt. In an amendment Hunt stated that the problem was "to discover the cause of discontinuity and movement of the continuous column of coal and to overcome it." Plaintiff says that Neville merely shows a device for "feeding pulverized coal to a furnace in which a conveyor screw 18 is provided at its forward portion 19 with a quadruple thread", and that the "powdered coal drips downwardly through a pipe 6 which blows the coal to the right and into the furnace by compressed air." In explaining his device Neville, in his application said:

"It is desirable that the fuel be fed to the delivery pipe 16 as uniformly as possible and in order to break up the quantities of fuel that will be fed rearwardly by the various turns of the forward end of the feeding screw I provide the rear end of the latter *with a quadruple set of feed plates,* as shown at 19. By this means the fuel is delivered to the pipe 16 with greater regularity than it would be delivered if the double screw were continued throughout its entire length." (p. 1, lines 87 to 97 inclusive).

Both the Hunt patent in suit and the Neville patent (No. 804,160) disclose a *plurality of threads* at the delivery end of the conveyor screw, for the avowed purpose, as stated by each applicant, of securing uniform or continuous delivery, to the succeeding receiving member. The fact that final delivery to the fire box in plaintiff's stoker is made by elevating screws and steam jets and in the Neville stoker by means of a pipe hardly seems sufficient to distinguish on controlling grounds the two alleged improvements to the horizontal conveyor screw. In each case the improvement was to the horizontal conveyor screw by making it with a plurality of threads. The type or character of the member which receives coal from the conveyor screw does not appear controlling. The sole novelty or improvement disclosed is a plurality of threads. The two conveyor screws perform the same function, in the same way, with substantially the same results. It would seem therefore that any alleged superiority of the Hunt conveyor screw over the conveyor screw disclosed in the Neville patent may be attributed to mechanical skill in constructing the screw rather than to difference either in mechanical principle or novelty. Once the idea of employing a plurality of threads for the purpose of securing a more continuous stream of coal was disclosed it became a matter of mechanical judgment whether one or more than one extra thread at the terminal end was more desirable, and as to what was the more desirable type of member to receive delivery from the horizontal conveyor screw.

*Wegener, No. 725,901.* This patent does not disclose double or any plurality of threads at the terminal or delivery end of the horizontal conveyor screw.

*Lower, No. 1,377,259.* This patent does not disclose any plurality of threads on the conveyor screw and is as contended by plaintiff distinguishable from Hunt No. 1,690,116.

*Fahnestock, No. 1,436,870.* This patent on conveying apparatus for mechanical stokers was granted on November 28, 1922, the patent discloses a conveyor screw having *double but tapering threads at its terminal or delivery end.* (See drawing Fig. 1 on following page for illustration).

With regard to his device Fahnestock in his application said:

"The object of my present invention is to provide a conveying apparatus by which a more *effective delivery* of fuel from the screw conveyor to the elevator may be ensured, and to reduce the amount of work imposed upon the screw conveyor in practical service." (p. 1, lines 24-30)

At the trial, an expert called by plaintiff testified with respect to the double flight feature of plaintiff's conveyor screw as follows (Turner, Trans. p. 67):

"The provision of the double flight at the forward end of the screw cooperates with the single flight or thread to impart a continuous steady pressure to the column of coal in the elbow and the conduit so that instead of the coal rising intermittently it was advanced continuously without any noticeable pulsations. This continuous pressure on the coal is bound to overcome packing or congestion of coal in the elbow and the vertical conduit and make it possible for this type stoker to feed any character or nature of coal."

A. B. FAHNESTOCK.
CONVEYING APPARATUS FOR MECHANICAL STOKERS.
APPLICATION FILED JUNE 13, 1922.

1,436,870.

Patented Nov. 28, 1922

3 SHEETS—SHEET 1.

FIG. 1

It will thus be seen, I think, that both patentees, in adding the extra thread, had the same object in view, namely, uniform delivery, although Fahnestock's screw tapered towards the delivery end while Hunt's remained of uniform diameter.

III. Hunt Patent No. 1,724,593

The "Notch Conveyor Screw" Patent.

This patent contains fourteen claims. Numbers 1 to 13, both inclusive, combine the horizontal conveyor screw with other members of a locomotive stoker. Number 14 is confined to the horizontal conveyor screw and is not in combination with any other of the numerous members or elements of a complete stoker. I think that claims Nos. 1 and 8 fairly illustrate the true character of the first 13 claims. They read as follows:

"1. In a stoker, a coal bin having an opening in its bottom, and a conveyor screw adapted to receive coal through said opening, the conveyor screw being formed, adjacent said opening, with projections extending along the screw thread, successive projections being axially spaced from one another a distance equal to a multiple of at least twice the pitch of said screw."

"8. In a stoker, the combination of a fuel receptacle or trough, a conveyor screw disposed in said receptacle and extending longitudinally thereof, said screw being rotatable to advance the fuel along the receptacle, the normal thread of the screw being formed at regular intervals with outwardly projecting segments conforming to the thread and providing extensions thereof for engaging with and feeding fuel lying outside the normal thread, the regular spaces between the projecting segments exceeding in length the pitch of the normal thread of the screw so that larger lumps of fuel may be received between and fed by said projecting segments than can be received and fed by adjacent normal threads of the screw."

Claim 14 which is a claim of a patent per se on the conveyor screw alone, reads:

"14. A conveyor screw adapted to be rotatably disposed in a fuel receptacle for advancing fuel therein, comprising a screw having a normal thread formed at regular intervals with outwardly projecting segments conforming to the thread and providing segmental fuel feeding flanges whose outer faces are in curves concentric with the outer face of the normal screw thread, said flanges being connected with the normal thread by substantially radial faces whereby sharp corners are formed."

In his application Hunt said:

"In stokers of the type where coal drops by gravity from a coal bin into a screw conveyer where it is engaged by the conveyer screw and moved forward, the conveyer screw may not operate effectively on a lump of coal that has a linear dimension greater than the pitch of the screw, because the screw can not get hold of it to move it. *The main object of my invention is to improve the construction of the conveyer screw at the points where it receives coal from the bin so that it will effectively engage unusually large, as well as smaller, lumps of coal and move the same.*" (Emphasis supplied by the Court). (p. 1, lines 6-19 inclusive).

The sole improvement or alleged novelty disclosed in the entire patent consists of a number of notches, or, as counsel for plaintiff designates them in the brief, "projections", "provided with sharp radial edges 31 adapted to engage and crush large pieces coal." In plaintiff's brief it is said:

"We contend that the novelty of patent 1,724,593 resides in the conveyer screw 16 constructed with the projections 30 and 32 forming the supplementary screw flight over the normal flight; and in the combination of such screw with the trough."

In claims 1 to 7, both inclusive, it is attempted to combine with the "Notch Conveyor Screw" a *"coal bin having an opening in its bottom"*, while in claims 8 to 13, both inclusive, the "Notch Conveyor Screw" is in combination with *"a fuel receptacle or trough"*.

Without setting forth a prolonged review of the evidence, the Court finds that the only material change or alleged novelty disclosed to a stoker or any member thereof mentioned in the claims consists of the notches in the horizontal conveyor screw. The other members of a stoker mentioned in the claims (the bin or tender and the trough or horizontal conduit) already old in the art, remain without any material change whatever. The evidence shows unmistakably that if those *un*improved members function better than they did before the construction of the "Notch Screw", such improvement is due solely to a better

screw and in no way to a better bin or trough.

Coming to claim 14 which as already said, is a claim to a patent per se on the conveyor screw alone. I think the evidence discloses patentable novelty in the "Notch Conveyor Screw" if that feature was not already anticipated when the Hunt application was filed. The testimony supports the contention of plaintiff that a screw of this type in the usual trough or conduit, more effectively engages and conveys the larger lumps of coal. The further fact that defendant in manufacturing stoker parts for the railroads has seen fit to place the segments (30 and 32 in figure 1 of the patent) on its screw thus simulating plaintiff's "Notch Conveyor Screw" and that the railroads purchase them from defendant strengthens this view. It further appears from the testimony that the "Notch Conveyor Screw" is used in the type B stoker manufactured by plaintiff and that about 4,000 of that type of stoker, are now in service.

*Prior Art—Godillot Patent No. 362,953.* This is the only patent cited against the "Notch Conveyor Screw" of Hunt. This patent was obtained by Godillot, May 31, 1887. In his application, Godillot said:

"My invention relates to that class of mechanical feeders or 'automatic stokers' wherein a screw or helix continuously revolving in a parti-cylindrical casing under a hopper, serves to feed the fuel into the furnace.

"In this class of feeders the screw or helix has heretofore been constructed uniform throughout its length that is to say, the spaces between the turns of the screw thread have been of uniform capacity from one end of the screw to the other. I find that in the operation of such feeders, especially when the *fuel fed is spent tan-bark, chips, or similar refuse,* the fuel packs in the channel or trough between the threads of the rotating screw, which is caused in the main by the pressure of the superincumbent mass in the hopper; but the fact that the feed is almost entirely at the outer end of the screw also aids greatly in packing the mass densely in the spiral trough, thus causing an enormous amount of friction between the moving fuel and the stationary mass above and the said fuel and the thread or spiral blade of the screw itself." (Emphasis supplied) (p. 1, lines 15-38 incl.)

The Godillot conveyor screw was intended primarily according to the patentee, to overcome obstructions in feeding a fuel known as "Bagasse" *containing fibre or thread like filaments.* As pointed out by plaintiff the Godillot patent does not show a conveyor screw having a complete normal thread but shows that portions of the normal thread are entirely cut away. The Godillot screw also has a changing (decreasing) pitch or diameter towards the terminal end to overcome choking and there is no specification of a supplementing thread built on the normal thread. Other material differences are apparent, including the fact that the Godillot device was designed especially to feed fuel radically different from coal. I am of opinion and so find that the Godillot patent does not anticipate the Hunt invention described in claim 14 of the patent 1,724,593.

## IV. Lower Patent No. 1,455,058

### The "One Piece Distributor".

As the coal is dropped or deposited by the upright conveyor screw on the plate or bottom of the tube, steam jets strike the coal driving it along the plate into the fire box. The steam jets without further mechanical aid are not sufficient to insure an even distribution of the coal throughout the fire box, because the jets blow the coal through the tube forwardly only.

The Lower device in patent 1,455,058 was designed to overcome this and to secure a more even distribution throughout the fire box. Further description of the device is quoted from the application (p. 1, lines 71-78, inclusive) as follows:

"The body of the tube 12 terminates near the inner surface of the back (rear) wall (of the fire box) 10, and is provided with upper and lower forwardly projecting plates 18, 19. The (lower) plate 19 is preferably *provided with an upstanding transverse lip 20,* and immediately back of this lip with laterally opening recesses 21, 22." (Words in parenthesis added by way of explanation, emphasis supplied.)

The sole novelty claimed for this device and disclosed by the patent resides in the abutment construction on the bottom distributor plate which is illustrated in the enlargement of "Fig. 2" of Lower's drawing in a copy of defendant's Exhibit E.

DEFENDANT'S PLATE
LOWER 1207422
LOWER 1455058
HANNA 979849
FIG. 2.

DEFENDANT'S EXHIBIT E

In this illustration 20 represents but does not very clearly show, the "upstanding lip" and 21 and 22 the "laterally opening recesses" immediately back of said "lip", that is, to say, as constructed and placed, the "recesses" in the plate are nearer to the steam jets than is the "lip".

The patent contains 9 claims. Claim 1, 4 and 7, may be fairly construed to embrace the bottom plate including the *abutment construction* as one part or member only. They read as follows:

"1. In a mechanical stoker, in combination, a plate over which fuel may be impelled and having a laterally opening channel near its forward end and an *abutment crossing its forward* end for stopping the advance of a portion of the fuel and causing it to fall into the channel."

"4. A fuel delivering device for stokers comprising a plate over the surface of which fuel may be impelled, and *an abutment crossing the path of such stratum of fuel* and being located beyond the end of the plate."

"7. In a mechanical stoker, in combination, a plate over which fuel may be impelled, and having a laterally opening channel adjacent its delivery end and *an abutment at the forward margin of the channel,* such abutment being approximately normal to the path of the impelled fuel and projecting above the level of the plate." (Emphasis supplied).

As granted, the Court is of opinion that claims 1, 4 and 7 of said patent 1,455,058 are valid and so finds.

In claims 2, 3, 5, 6, 8 and 9 the abutment construction is claimed, in combination, not only with the bottom plate, but variously with one or more of the following: "means for delivering a fuel impelling blast over the surface of the plate", "means for delivering an impelling blast through the tube", "a locomotive having a fire box", "a fluid discharging nipple", "means for discharging an impelling blast of fluid under pressure through the tube", "a substantially horizontal tube", "a blast nozzle discharging through the tube", and "a nipple for discharging fluid under pressure over the surface of the plate."

The single novelty of Lower patent No. 1,455,058 is aptly described in the brief of counsel for plaintiff as follows: (Pp. 25-26):

"*Novelty.* We contend that the novelty of patent 1,455,058 resides in the abutment construction of the distributor whereby a large proportion of the coal striking the abutment bounces generally backward and drops downward.

"1. Novel Results are Obtained from *the Abutment Construction.*

"The abutment at the front end of the distributor serves to distribute the coal more uniformly over the fire grate, for not only is fuel freely blown over the middle and forward part of the grate, but a proper proportion is reserved for the rear and rear corners of the grate by the operation of the abutment. (Patent 1,455,058, page 1, lines 99-109, page 2 lines 10-12; Turner, R. 286, lines 12-17)".

Citing as authority for the statement the Lower patent page 1, lines 99-109, p. 2 lines 10-12 and the testimony of plaintiff's expert witness Mr. Turner, as follows:

"* * * In Lower, the coal falls on to a blast which directs the coal or a portion of the coal against an abutment wall which actually stops or arrests the movement of a certain portion of the coal causing that to fall into the channels and drop to the back corners."

The patent does not disclose any novelty in or improvement to any of the numerous other parts or members set forth in claims 2, 3, 5, 6, 8, and 9, in combination with the abutment construction on the bottom plate. All those other parts or members, certainly so far as this controversy is concerned, are old in the art and remain unimproved and function as they did theretofore.

Against the device of Lower in suit, defendant has cited numerous prior patents in an attempt to show anticipation. Defendant further contends that even if the Lower patent is held valid, it has not been infringed by defendant, and in support of the latter contention, charges that plaintiff is not practicing the art as set forth in Lower's said patent but instead, manufactures and sells commercially a plate which differs very materially from the device disclosed by Lower in No. 1,455,058.

As the more important patents cited by defendant to show anticipation, were reviewed and considered by the Patent Office in passing on Lower's application for patent 1,455,058, it is desirable to review some of the proceedings in the Patent Office.

The original lower application was filed August 8, 1918, but the patent was not

granted until May 15, 1923. In the interim there were numerous rejections by the Patent Office and amendments submitted by Lower. While the application was pending the principal prior art patents here pleaded were considered by the Patent Office and the Primary Examiner held that the device shown by Lower's *final amended application* was anticipated by the prior art.

From the adverse decision of the Primary Examiner, Lower appealed to the Board of Examiners in Chief. In the brief filed on behalf of Lower in support of his appeal (File Wrapper p. 53) it was said:

"The structure upon which the appealed claim is based is shown in Figs. 1 and 2 of the drawings, the vital part being the upstanding abutment 20 which projects a short distance above the bottom of the distributor tube 12,—this bottom being shown in plan in *Fig. 2.* (An enlargement of Fig. 2 is shown in the copy of Exhibit E on page 31 of this opinion [29 F.Supp. 362])

"The action of the claimed device is stated in the amendment to line 21 et seq, page 3 of the specification, entered July 28th, 1920, and reading:

" 'When the lip 20 is present it constitutes an abutment as distinguished from a deflector directly crossing the path of the lower stratum of fuel as it advances over the feed plate or bottom of the tube 12. Particles of fuel striking this abutment are stopped and drop into the channels 21, 22, from which they roll laterally upon the grate.' "

The Board of Examiners in Chief reversed the Primary Examiner's adverse decision (File Wrapper p. 58-59) saying:

"This is an appeal from the action of the primary examiner finally rejecting the following claim:

"A fuel delivering device for stokers comprising a plate over the surface of which fuel may be impelled, and an abutment crossing the path of such stratum of fuel and being located beyond the end of the plate.

"The references relied upon are:

Gee, 1,103,406, July 14, 1914,
Rait, 1,149,685, Aug. 10, 1915,
Lower, 1,207,422, Dec. 5, 1916.

"None of the references appears to disclose an abutment *crossing the path* of the stratum of fuel beyond the end of the plate whereby that portion of the fuel stream which engages the abutment is for the most part arrested and allowed to drop by gravity through the lateral recesses 21, 22 to a region of the grate lying adjacent the fuel intake. Of the art cited, the partitions 10, 10c, Fig. 11 of Lower approximate most nearly appellant's abutment but the transverse portion of these partitions do not lie across the path of the fuel but rather act as lateral guides to the side streams of fuel which have been turned into a course at right angles to the original flow by the curved portions of the partitions. It follows that the fuel in these side channels is not arrested and permitted to drop by gravity on the portion of the grate lying beneath the fuel intake but by reason of its momentum is carried a substantial distance from the intake. By appellant's arrangement he obtains a more equal distribution of the fuel on the grate."

In other words, if I construe the Board's decision correctly, it held that the Lower patent in suit as finally amended and submitted, disclosed abutments not deflectors, in the language of the Board, "crossing the path of the stratum of fuel beyond the end of the plate whereby that portion of the fuel stream which engages the abutment is for the most part arrested and allowed to drop by gravity through the lateral means 21, 22 to a region of the grate lying adjacent to the fuel intake."

That Lower actively urged and intended for the Board so to interpret his amended claims is clearly apparent from the brief he filed in support thereof in which it was said:

"The writer begs to say that he does not get the Examiner's point of view in refusing to recognize a distinction between an abutment and a deflector." (File History p. 23)

"The word 'abutment' seems to have a well defined meaning, and the explanation in the amendment to the specification, that it was to be distinguished from a deflector, ought not to be necessary, but may as well stand.

"According to the Century Dictionary an abutment, when employed in connection with gases, liquids, or other material to which motion has been imparted, signifies that a wall or like structure is interposed across the path of such moving material and stops its motion. A deflector, according to the same authority, changes the direction of the material which impinges against it, leaving it, however, free to con-

tinue its movement under the momentum which it has acquired.

"In this instance there is a wall directly crossing the path of the lower stratum of fuel which is impelled through the tube by the steam blast. Coal striking this wall is completely arrested and drops not by reason of the momentum imparted to it by the blast but under the influence of gravity. It is recognized that the inner end of this wall is given a curved form and so acts upon the fuel which strikes it as a deflector, but this curvature merges into a part of the wall which is normal to the path of the fuel." (File history p. 27, 28)

"The fact that adjacent the median line of the tube the upstanding wall is curved so as to act as a deflector, does not deprive the remainder of the wall of its function as an abutment, and an applicant is entitled to claims for an abutment, even though there may also be present a deflector." (File History, p. 30)

"The Examiner is requested to waive final rejection in order to permit the reforming of claim 7. The applicant cannot accept the interpretation of the references given them by the Examiner, which involves the words, 'abutment' and 'deflector' as being synonymous. *Applicant has used the word 'abutment' in accordance with its dictionary definition and means to imply that he has a wall which positively arrests the advancing fuel and permits it to drop under the action of gravity.*" (File history p. 39). (Emphasis supplied.)

"In the claimed construction the fuel is thrown against a wall extending directly across the line of travel, and is consequently stopped not merely given a different direction of movement. When so stopped it would remain stationary but for the action of gravity." (File history p. 55).

Defendant contends, in substance, that the distributor actually manufactured and sold commerically by plaintiff, departs radically from that specified and illustrated in the patent as finally granted, and that it is not confined within the restrictions and narrow limitations placed upon the patent in the amendments finally submitted by Lower and approved by the Patent Office at his instance and that defendant has the right to manufacture and sell its type of distributor plate so long as its plate embodies the deflector type of transverse obstruction as distinguished from the abutment construction called for in Lower No. 1,455,058. With respect to that contention, defendant's expert testified as follows:

"A. Because those channels (referring to a specimen of plaintiff's plate) are more in the shape of deflectors than they are abutments. They are curved outwardly more than they do laterally. Whereas the abutment shown on the patent drawing are substantially perpendicular to the axis of the fuel.

"Q. You mean the abutments would extend across the path of the fuel so as to stop the fuel?

"A. That is right.

"Q. And what would be the effect of particles of coal being blown against the guiding faces of this plate before us?

"A. They would be deflected forward, naturally, the distance according to the jet that propelled the fuel.

"Q. How do the guiding faces of this burnt distributor plate compare with the guiding faces of the distributor plates that were manufactured by the Berkley Company?

"A. They are substantially the same." (R. 217)

This witness was then exhibiting to the Court a burnt distributor plate manufactured by plaintiff, taken from a railroad scrap yard.

See copy of defendant's Exhibit E above to which is attached a photograph of the burnt distributor plate, exhibited by the witness.

The red pencil lines[1] in each instance were added by the Court to represent extensions of the inner surface of the walls of the tube to the *transverse obstruction,* whatever we may finally decide to call that part, which is interposed in the path of the blown coal. Plaintiff calls this transverse obstruction *"abutments"* and defendant calls it *"deflectors"*.

The differences between the shapes of Lower's device in suit as shown in Lower's amended application, see his illustration Fig. 2 in patent; defendant's plate in suit; the plate actually manufactured by plaintiff; and the prior art, Lower's earlier patent No. 1,207,422 and Hanna's patent No. 979,849, are all clearly and accurately shown in defendant's Exhibit E, a copy of which is above attached.

1 [Ed. Note.—Shown by broken lines.]

These illustrations in the exhibit show without serious doubt, I think, that plaintiff in manufacturing and selling its plates, has departed very materially from the limitations and restrictions which Lower finally submitted and accepted in order to obtain patent 1,455,058. In other words, Lower voluntarily confined his device to an abutment construction only, in order to avoid the prior art as disclosed in his older patent No. 1,207,422 and other patents. But in the device which plaintiff actually manufactures, the deflector idea clearly predominates, it seems to me, over the abutment idea, so that plaintiff's commercial plate in both mechanical principle and alleged novelty, adopts the prior art rather than the device described and disclosed by the later Lower patent now in suit, particularly as that device, at the instance of Lower, was interpreted by the Patent Office.

The Court therefore finds that the distributor manufactured by defendant does not infringe patent No. 1,455,058.

Having thus narrowed his claims in the Patent Office and restricted them to a specified type of obstruction in the bottom distributor plate in order to secure the patent neither Lower nor his assignee ought now to give the claims broad interpretations so as in effect to embody the type of construction which the narrower claims were intended to avoid. Doughnut Mach. Corp. v. Joe Lowe Corp. et al., 4 Cir., 67 F.2d 135, at page 138, as follows:

"If complainant's contention that it is entitled to protection on account of the novelty of the cutting device is sustained, the effect will be to construe the patent as if it contained the claims which were rejected and withdrawn. This may not be done. Royer v. Coupe, 146 U.S. 524, 532, 13 S.Ct. 166, 36 L.Ed. 1073. As said by Mr. Justice Day in Computing Scale Co. v. Automatic Scale Co., 204 U.S. 609, 617, 27 S.Ct. 307, 310, 51 L.Ed. 645: 'It is perfectly well settled in this court by frequent decisions that where an inventor, seeking a broad claim which is rejected, in which rejection he acquiesces, substitutes therefor a narrower claim, he cannot be heard to insist that the construction of the claim allowed shall cover that which has been previously rejected.' See, also, Smith v. Magic City Club, 282 U.S. 784, 789, 51 S.Ct. 291, 75 L.Ed. 707; Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425, 429, 14 S.Ct. 627, 38 L.Ed. 500; Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U.S. 38, 40, 14 S.Ct. 28, 37 L.Ed. 989; Shepard v. Carrigan, 116 U.S. 593, 597, 6 S.Ct. 493, 29 L.Ed. 723."

Weber Electric Co. v. E. H. Freeman Electric Co., 256 U.S. 668 at page 677, 41 S.Ct. 600, at page 603, 65 L.Ed. 1162:

"Thus the patentee, in order to avoid infringing Kenney's construction, voluntarily restricted himself to a 'specific structure' operative when the sleeve was 'simply' inserted in the cap, without suggesting any rotary movement whatever, but, on the contrary, by his reference to Kenney as locking and unlocking by 'simply rotating one member upon another', clearly implying that no such rotary movement was necessary in the adjustment of his socket. Having thus narrowed his claim against rotary movement in order to obtain a patent the patentee may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments, which amount to a disclaimer of rotation as an operative feature of his device. Shepard v. Carrigan, 116 U.S. 593, 598, 6 S.Ct. 493, 29 L.Ed. 723; Hubbell v. U. S., 179 U.S. 77, 80, 21 S.Ct. 24, 45 L.Ed. 95."

Also Black & Decker Co. et al. v. Baltimore Truck Service Corp. et al., D.C., 26 F.2d 686; Crozier-Straub Inc. v. Maryland Concrete Corporation, D.C., 39 F.2d 126, 130; Automatic Switch Co. v. Monitor Mfg. Co., C.C., 180 F. 983, 959; Handel Co. v. Jefferson Glass Co., D.C., 265 F. 286, at page 292, affirmed, 4 Cir., 277 F. 1015

V. Lower and Chalker No. 1,642,076
The "Three Piece Distributor".

With reference to the device embodied in this patent the patentees in their application said:

"One of the objects of this invention is to provide a construction in which the parts of the distributor which are in danger of being burned off are removable, thus reducing the cost of replacement. A further object of the invention is to provide means for cooling the exposed parts, and thus lengthening their term of service, and a still further object is to provide an improved form of baffle or abutment for arresting a portion of the impelled fuel and delivering it to the back end of the fire box. (p. 1, lines 17-28 inclusive).

"A stem 23 projects forwardly from the body of the plate 19 of which it constitutes an integral part and at the forward end of this stem there is carried a cross bar 24, the length of which is substantially equal to the width of the plate 19. The inner face of this bar is preferably flat and projects somewhat above the plane of the upper surface of the plate 19 forming an abutment for arresting the lower stratum of coal impelled through the tube.

"The stem 23 and abutment 24 are cored to form a continuous passage there through, as indicated at 25, 26, the passage 26 extending longitudinally through the abutment and being open at the ends thereof. (p. 1, lines 94-109 incl.)

"* * * The lower stratum of the fuel follows the bottom of the tube and encountering the upstanding *abutment 24 is arrested and dropped upon the rearward end of the grate.* Lumps of coal in the lower stratum which strike the abutment 24 below their centers of gravity bound over the abutment and fall upon the grate a little in front of it." (p. 2, lines 66-74 inclusive).

This patent is directed to a distributor made in three parts, and is a distributor tube provided with an open bottom adapted to receive a *removable bottom plate,* with the top of the tube adapted to receive a *removable top plate.* The tube, as in the device Lower No. 1,455,058, already discussed, is connected to the top of an elevator conduit, from which the tube projects forwardly to the firebox. See illustrations.

The present device is manifestly the same type of fuel distributor disclosed in Lower No. 1,455,058, the only mechanical difference being that this device is made in three parts instead of one. There are no functional or operative differences between the two, but they are alike in all essentials and function alike in all material respects although apparently there has been some attempt to vary shape and finish. The bottom plate in this device and the device disclosed in No. 1,455,058 are

SHEET IV

identical. The plaintiff stresses the fact that in this device there is *novelty and facility* in the means for detachably connecting the tube (proper) with the top and bottom plates. That the means for connecting and disconnecting the three parts, namely, lugs, sockets and holes, are old and well known mechanical expedients is too clear, I think, for serious difference of opinion.

As already said, the sole novelty disclosed in this type of distributor is in the abutment construction which is expressly described and embodied in claims 1 to 7 and 10 and 11 of the present patent. Claims 8 and 9 include "a removable deflector", and 12 "a fuel deflector member on the upper side of a distributor tube" but so far as I am able to perceive each of those claims fails to disclose any real novelty that was not anticipated by prior patents referred to by the Patent office when No. 1,455,058 was under consideration. Claim 12 includes a "fuel deflector member for use on the *upper side* of a distributor tube", but novelty is not apparent as the top plate in this device and that in No. 1,455,058 are alike in all essentials— Claim 13 includes "a fuel deflecting *abutment*." If it is intended by this claim to embody true abutments it is anticipated by No. 1,455,058; if true deflectors are intended then by the prior art patents already referred to.

Merely dividing the distributor and tube into three members and employing lugs, holes, and sockets to detachably join them into one member, which if constructed according to the patent, still performs the same function in the same manner and with the same results as in No. 1,455,058 when that distributor is constructed according to that patent, is not invention. Bernz v. Schaefer et al., D.C., 205 F. 49, affirmed, 3 Cir., 211 F. 973; Laclede Christy Clay Products Co. v. City of St. Louis, 8 Cir., 280 F. 83, and Howard v. Detroit Stove Works, 150 U.S. 164, at page 170, 14 S.Ct. 68, at page 70, 37 L.Ed. 1039, where it is said:

"* * * As to the second patent, it is void because the bolting or riveting together of sections of a stove was well known at the time of the invention, and the use of lugs with holes perforated through them was anticipated in other stoves and furnaces manufactured many years prior to the date of the patent. As to the third patent, it is void because the claims in it were clearly anticipated, and because it involves no invention to cast in one piece an article which has formerly been cast in two pieces, and put together; nor to make the shape of the grate correspond with that of the fire pot."

The plaintiff's practice of departing from the device described and disclosed in patent No. 1,455,058 with particular respect to the transverse obstruction in the bottom distributor plate has already been discussed. The evidence shows clearly that the same practice has been followed by plaintiff in constructing the "Three Piece Distributor", that is to say, while 9 of the 13 claims (1 to 7 and 10 and 11), in varying language, call for a transverse abutment in the plate *"for arresting the lower stratum of coal impelled through the tube"*, in actual practice, plaintiff constructs the plate with deflectors which serve to alter the course of the lower stratum of coal rather than to arrest it, which device as actually constructed and sold by plaintiff, was anticipated by prior art patents Lower No. 1,207,422 and Hanna No. 979,849.

The Court finds therefore (1) that the only novelty disclosed by Lower and Chalker No. 1,642,076 was anticipated by Lower No. 1,455,058 reviewed above; (2) that the device actually manufactured and sold by plaintiff commercially, with respect to the transverse obstruction departs from the patent materially, and as actually constructed is anticipated by prior art patents which have been discussed herein, and (3) that defendant has not infringed patent No. 1,642,076.

Other Prior Art Patents Cited Against Lower and Chalker No. 1,642,076.

*Street No. 1,195,531.* This patent was obtained August 22, 1916, and relates to fuel distributors. The objects are to provide an improved detachable distributor end and to provide an improved form of connection having interlocking projections, between the parts whereby the flaring distributor end may be retained in its position by gravity and inclined at any desired angle, and be readily detached and renewed when necessary. A very good description of the Street patent was given in the testimony by a witness for defendant:

"This patent, discloses a distributor tube reference 19, which is equipped with a separable distributor plate which is held in place by a lug, 32, going through a hole

in the top of the tube and resting by gravity on shoulders, 34. It is in the form of a cantilever and is held in place by gravity on the interlocking devices."

These various parts are connected by one or more notches or openings (32) and corresponding hook-shaped projections (37) formed on the distributor end.

*Whitmore No. 1,288,334.* This patent has reference to grain spouts. The object was to provide a certain desired manner of securing *removable or renewable bottoms* of a section in a position where it will be firmly and permanently held until necessary to remove it. Another object was to have a removable spout section.

The defendant cites this as prior art as it reveals the removable bottom with interlocking devices for holding it in position and urges that the Whitmore device could be made of heavier material so as to handle coal instead of grain. The plaintiff claims that Whitmore does not reveal the present patent in that his was a grain spout which is very remote to any use as a distributor of coal. However, as said above, the interlocking lug arrangement in the "Three Piece Distributor" does not disclose any patentable novelty that was not anticipated. It appears from the disclosures made in the Street and other patents that any first class mechanic could easily have made simple well known mechanical alterations to meet the requirements of detachably connecting the three parts. See Howard v. Detroit Stove Works, 150 U.S. 164, at page 170, 14 S.Ct. 68, 37 L.Ed. 1039, quoted above.

Of the Plaintiff's Combination Claims.

From the foregoing findings of fact, it will be seen that each of the claims in patents Lower No. 1,373,748, and Hunt No. 1,690,116; claims 1 to 13 both inclusive, of Hunt No. 1,724,593; claims 2, 3, 5, 6, 8 and 9 of Lower 1,455,058, and claim 11 of Lower and Chalker No. 1,642,076, combined with the particular part or member of a stoker that was improved, one or more old parts or members that remained unchanged and unimproved; that is to say, in each of those claims, only one member of the combination was improved by the patented device. In three instances the patentee simply made a better horizontal conveyor screw, and a better bottom distributor plate in the two other instances. To state the matter another way, the conduits, horizontal and elevating; the elevating screws, the locomotive, the coal tender or bin, the elbow hopper, the tube, and the mechanical appliances for operating steam jets in the tube, remained and functioned just as before the improvement to the horizontal conveyor screw or to the bottom distributor plate was made.

Did the plaintiff's assignor by improving only one member or part of an old combination have the right to that improvement in combination with other old parts which remained unimproved and functioned just as they did before? It seems to me that Lincoln Engineering Co. v. Stewart-Warner Corp., March, 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008, is controlling. There is it said:

"The petitioner's principal contention is that our decision in the Rogers Case [Rogers v. Alemite Corp., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251] is controlling. We so hold. As has been said, the combination of elements disclosed is old in the art. As the Circuit Court of Appeals held, a headed nipple or fitting connected with the bearing, and to be coupled to the conduit from the grease gun, is old and unpatentable. A compressor or pump for propelling lubricant is old and unpatentable as such. The invention, if any, which Butler made was an improvement in what he styles in his specifications the 'chuck' and in his claim a 'coupling member.' It is not denied that multi-jawed chucks had been used in industry and as couplers in lubricating apparatus. Butler may have devised a patentable improvement in such a chuck in the respect that the multiple jaws in his device are closed over the nipple by the pressure of the grease, but we think he did no more than this. As we said of Gullborg in the Rogers Case, having hit upon this improvement he did not patent it as such but attempted to claim it in combination with other old elements which performed no new function in his claimed combination. The patent is therefore void as claiming more than the applicant invented. The mere aggregation of the number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention. And the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination. Though the respondent

so concedes, it urges that, in the combination of the Butler patent, the headed nipple performs a new and different function from that which it has heretofore performed, in other combinations, in that, when the coupler is withdrawn from the nipple, at the end of the greasing operation, the rounded head of the nipple 'cocks' the jaws of the coupler for the next operation. The suggestion seems to be an afterthought. No such function of the nipple is hinted at in the specifications of the patent. If this were so vital an element in the functioning of the apparatus, it is strange that all mention of it was omitted. Moreover, the argument is unsound since the old art includes instances where the head of a nipple or fitting performs a similar function when the chuck is disengaged from it. The same argument was unavailing in the Rogers case. It was there contended that the pin fitting of the Gullborg patent performed a new function in causing the beneficial operation of the coupler at the moment of disengagement. We commented upon the matter thus: 'The design of the bayonet slots is such that, in uncoupling, the coupling member of the gun will at first be moved slightly forward on the pin fitting thus backing up the perforated washer in the bore of the coupler.' But there, as in the present case, it was the peculiar and improved mechanism of the coupler which brought about the result and not the form of the fitting. We suppose that a headed nipple has always been so headed in order that the jaws of the chuck may slip over the head in the coupling and uncoupling operation. The weakness of the respondent's position is well illustrated by what developed at argument. When interrogated as to how in the claimed combination the function of the nipple could be thought novel in any different sense than the function of the pump, counsel replied that the pump performed a novel function because the pressure it generated forced forward the piston in the coupler and caused the movable jaws to engage the fitting. If this argument is sound, the respondent may convict every one who sells a grease pump of contributory infringement. The answer is the same as in the case of the headed nipple. The function of a pump has always been to force a fluid or a grease through a conduit. The fact that this function of the pump is utilized in Butler's improved form of coupler not only to convey the lubricant to the bearing but to operate the jaws of the chuck does not alter the function of the pump. The invention, if any, lies in the improvement in the coupling device alone."

The plaintiff has strongly relied upon the decision in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805, to sustain its combination claims. What was said of the Leeds & Catlin case in the Lincoln Engineering Co. case, supra, I think completely answers plaintiff's theory. See 303 U.S. at page 551, 552, 58 S.Ct. at page 665, 82 L.Ed. 1008, as follows:

"The courts below and the respondent rely upon Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 325, 29 S.Ct. 495, 53 L.Ed. 805. In the Rogers Case we held that authority not controlling. Berliner disclosed an entirely novel principle; he utilized the flat disc having a smooth bottomed groove with spiral waves in its sides not only to agitate the needle connected to the diaphragm, but, in combination with a swinging arm, to propel the needle lengthwise the groove. In his combination, the disc not only performed a new function but performed it in combination with another new element—the swinging arm which carried the needle.

"We conclude that Butler's effort, by the use of a combination claim, to extend the monopoly of his invention of an improved form of chuck or coupler to old parts or elements having no new function when operated in connection with the coupler renders the claim void."

See also: Leitch Mfg. Co. v. Barber Co., 302 U.S. 458 at page 463, 58 S.Ct. 288, 82 L.Ed. 371, and Rogers v. Alemite Corp., and Bassick Mfg. Co. v. Hollingshead Co., both reported, 298 U.S. 415 at pages 424, 425, 56 S.Ct. 787, at page 791, 80 L.Ed. 1251, as follows:

"Leeds & Catlin v. Victor Talking Machine Co., 213 U.S. 301, 325, 29 S.Ct. 495, 53 L.Ed. 805, on which the respondent relies, is not in point. There the patent was a pioneer patent and the combination was of elements which were novel and neither of which possessed utility without the other. Each element was necessary to the operation of the other. The invention did not, as here, consist of the mere improvement of one element of an old combination.

"We are of the opinion that the owner of the patents cannot extend the monopoly of its patent for a pin fitting to preclude the use therewith of any grease gun not embodying the improvement in the coupling

device evidenced by the patent in suit; and cannot extend the monopoly of the combination patent in suit to prevent the use of a pin fitting which does not infringe the fitting patent, 1,307,733, with a gun having a coupler such as that claimed in the patent in suit."

The two controlling principles are briefly stated in two decisions of our Circuit Court of Appeals as follows:

Denominational Envelope Co. v. Duplex Envelope Co., 4 Cir., 80 F.2d 186, at page 191:

"It is well established that patentability may reside in a combination of old elements to produce new results, and a fortiori, this may be true when one of the elements in the combination is itself new and patentable. The new element may be patented alone and the combination may also be patented, especially when a new part of a machine is invented which has no utility or functional importance except as a part of the whole. Bassick Mfg. Co. v. Adams Grease Gun Co. (C.C.A.) [2 Cir.] 52 F.2d 36; Doughnut Mach. Corp. v. Joe-Lowe Corp. (C.C.A.) [4 Cir.] 67 F.2d 135."

Doughnut Mach. Corp. v. Joe-Lowe Corp., 4 Cir., 67 F.2d 135 at page 137:

"And the criterion for distinguishing between patentable combination and mere aggregation is thus tersely stated by Mr. Justice Brown in Richards v. Chase Elevator Company, 158 U.S. 299, 302, 15 S.Ct. 831, 833, 39 L.Ed. 991: 'Unless the combination accomplishes some new result, the mere multiplicity of elements does not make it patentable. So long as each element performs some old and well-known function, the result is not a patentable combination, but an aggregation of elements.'"

The Court concludes therefore that plaintiff's combination patents and claims, above enumerated, are void as claiming in each instance more than was invented.

### The Nature of the Alleged Infringements.

The Court finds from the evidence that plaintiff is engaged in manufacturing and selling "Duplex" and "Type B" locomotive stokers and parts; that defendant, Berkley Machine Works & Foundry Company, Inc. (hereinafter referred to as Berkley company), before these suits were instituted made parts for locomotive stokers and sold them exclusively to railroads for repair purposes. No parts have ever been made for or sold by defendant to stoker companies or to any one for the purpose of assembling stokers nor has the Berkley company ever built any stokers, or assembled parts, but its business, so far as this controversy is concerned, has been confined to manufacturing and selling parts for repairs to stokers or for the replacement of parts therein from time to time as such parts have worn out or broken. Defendant made some stokers for the B. & O. Ry, but they were from plans furnished them by that railroad and are not shown to have been infringing devices of any patent in suit.

Defendant had a list (typed sheets) of the parts offered by it for sale. This list was headed "Repair Parts for Replacement of Parts of the Standard Stoker Co." The parts as thus listed were made and sold separately not in any combination or assembly and were so far as the evidence discloses used by the purchasers (railroads) solely for repair and maintenance. The parts manufactured by defendant have never been used by the railroads to construct new stokers to the knowledge of the Berkley company or so far as the proof shows. The Berkley company does not manufacture all the parts necessary for the construction of either type of new stokers manufactured by plaintiff so that complete Standard (whether Duplex or Type B) stokers could not have been built from parts supplied by defendant.

The plaintiff cites one instance where an explosion occurred in an engine of Seaboard Air Line Railway and that Railway in rebuilding the stoker used four (4) parts apparently manufactured by the Berkley company. Some of the parts used in rebuilding were made by the Seaboard Railway and other parts of the old stoker were utilized. It was not shown that the Berkley company had any knowledge whatsoever of such action by the Railway.

Individual parts used by the Southern Railway to build six new stokers referred to in plaintiff's testimony apparently were made by plaintiff and the rebuilding occurred during an emergency when that railway could not promptly obtain new stokers.

A complete stoker of either type manufactured by plaintiff is composed of many separate parts or members joined together. The Court finds also that the locomotive stokers operated by the railroads were sold to them by plaintiff or its predecessors without restriction; that every part of a

stoker is vital to its operation; that the conditions under which locomotive stokers are used are such that all parts wear out, deteriorate or break in normal service, and normally, many parts of a stoker wear or give out more rapidly than others, but that there is no particular uniformity in this, and any part may fail at any time, depending greatly upon the conditions under which the stoker is used, how constantly it is used, and the inspection and repair practices of the different railroads in connection with stoker maintenance. Locomotive stokers require frequent repairs and frequent replacement of parts to keep them in serviceable condition and it is the practice of the railroads to keep stokers in service as long as possible by repairing them and replacing parts.

No stoker so far as the evidence discloses has ever worn out and the evidence shows that if a stoker is taken care of and properly repaired, it should normally last as long as a locomotive. So far as the evidence discloses plaintiff has never refused to supply parts for repairs or replacements in its stokers on account of the age of such stokers or of their being badly worn or broken. Some of the stokers supplied to one of the railroads were sold in 1921, and another railroad is using some stokers about twenty years old.

Plaintiff issues a manual purporting to teach the railroads the extent of wear of various stoker parts that can be safely tolerated before they need to repair or replace them, and has cataloged and been willing and ready at all times to sell to the railroads any or all parts that make up its stokers, so that any injured or worn-out parts of a stoker could be replaced by parts ordered for stock and kept on hand for that purpose whenever repair or replacement was desirable or necessary. Plaintiff refers in its catalogs to its stoker parts as "repair" parts. It has been the established and necessary practice of the railroads to buy and stock for future needs parts corresponding to substantially all parts of their stokers in serviceable condition at all times.

It would cost substantially more to build a stoker from repair parts than to buy a complete new stoker. A new stoker such as built by plaintiff costs about $2,250, but the most expensive member or part of a stoker costs only about $350 net. Conveyor screws cost from $57.75 to $156.-89. Normally the screws wear out and have to be discarded many times before a stoker has to be discarded as a whole. The majority of the stoker parts manufactured by defendant may fairly be termed quick wearing or perishable parts. Ordinary repairs or replacements in stokers such as were made with parts manufactured by defendant served to maintain the stokers in serviceable condition and were not sufficient to destroy the identity of the stoker or to convert it into a new and different stoker.

The following quotations from the testimony of plaintiff's service engineer describes the practice of the railroads with respect to repairs and replacements (Robertson, Rec. pp. 33-36):

"Q. And when in operation a stoker, Mr. Robertson, wears out or breaks, that part has to be repaired or replaced in order for the stoker to go on in service, doesn't it?

"A. Yes, sir.

"Q. That is regular railroad practice in the maintenance in service of their stokers, to your knowledge, isn't it?

"A. Yes, sir.

"Q. Now, referring to these stoker parts, I understand it to be the case that in one stoker it might be the conveyor screw that went first, in another one it might be a different conveyor screw, in another one it might be the rack or pinion, or something, but it just depends on the particular circumstances and use of that stoker, and that there is no rule as to when any particular part may have to be renewed with respect to any other part, is that right?

"A. Well, as a rule, after the locomotive has made what is considered its maximum mileage, it is brought in the shop, stripped down, and if necessary, rebuilt. At the same time it is the usual custom to take the stoker out and renew all repairs and parts. In other words, restore the stoker to serviceable condition at the time the locomotive is in the shop.

"Q. And that is what they refer to in railroad practice as a shopping, isn't it?

"A. That is right.

"Q. For example, after 50,000 miles of a freight engine, or 100,000 miles of a passenger engine, they take it in for general inspection and overhaul?

"A. Yes. I would not say that is the exact amount of mileage, but use that as an illustration.

"Q. I did not mean to say that was the exact mileage, but used that as an illustration.

"A. Yes, sir.

"Q. And then, when they go over it the parts that are so bad that they won't last until another shopping are repaired and replaced, aren't they?

"A. Yes, sir.

"Q. A stoker may come in one time and require the part X to be renewed, and another time it might require the part Y to be renewed, is that right?

"A. That is right.

"Q. And it just depends on what has happened in the meantime as to which goes first?

"A. Yes, sir.

"Q. Some of the railroads maintain the stokers better than others, I assume?

"A. Yes, sir.

"Q. Some of them run them until they won't run at all, and others keep them in the pink of condition?

"A. I don't know of any in my territory that run them until they are gone. They usually try to keep them up.

"Q. But certainly some of them run them longer than others?

"A. Yes, sir.

"Q. And whether they take them out and put in a new one or whether they repair them or not, is according to the railroadman's judgment?

"A. Yes, according to his judgment and the service man of our company. We usually cooperate with him in that work.

"Q. As a matter of fact, you and Mr. Myers go around and help the railroads maintain these stokers, is that right?

"A. We don't do the actual work, but we might say supervise.

"Q. Advise them?

"A. Advise them.

"Q. And you also check over their repair parts stores and advise them what parts they will need for the next month or so, from then on?

"A. We figure about sixty to ninety days.

"Q. In other words, part of your job is to see that their repair parts are stocked to keep them in maintenance during the life of the stoker?

"A. That is part of our duties. We have to ride the locomotives to see the application, supervise the application of new stokers, etc."

It was the practice of defendant's representative to visit the railroads and ascertain parts of stokers that defendant could make. This representative examined the different parts on hand in the railroad supply stores to ascertain whether or not there were any patent markings thereon and only parts that were without such markings were made. Neither complete stokers, nor any lesser assembly thereof, were made by defendant. As indicated by the typed list of parts made by defendant, such parts were for use in stokers made by plaintiff and were usable with other parts made by plaintiff, and were interchangeable therewith.

As above stated, the Court finds that claim 14 of Hunt No. 1,724,593, is a valid patent per se of the horizontal conveyor screw as a single member of a stoker. In manufacturing and selling that type of conveyor screw defendant directly infringed the patent.

With respect to claims 1, 4 and 7 of Lower No. 1,455,058, which the Court holds are valid: As stated in another part of the opinion, the Court does not find that defendant made or sold distributors which simulated the device described in those three claims and disclosed by patent No. 1,455,058. The reasons for this conclusion need not be here repeated.

Of the many cases cited by counsel for both parties on the subject of contributory infringement the decision in Automobile Parts Co. v. Wisconsin Axle Co., 6 Cir., 81 F.2d 125, 126, appears to be more nearly in point and to more clearly state the general rule applicable in such cases:

"The invention is for a composite thing, embracing several elements or parts, all of which are necessary to and cooperate in the operation of the patented unit. We cannot subscribe to the view that the test of contributory infringement in the furnishing of parts for a combination invention is whether the parts furnished constitute the gist or essence of the invention; indeed, we cannot see how it may be said that any one element or another marks the advance step or is the essence of such an invention. There are cases, it is true, in which the phrase 'essence of the invention' is used; but in our view, when the facts in those cases are considered, it cannot be said that the conclusions reached were the result of a logical selection of one or more elements of the combination as the gist or essence of the invention. Neither can we

accept the appellee's theory, for it seems plain to us that if it sells one of its axles and the shaft or gearing breaks by accident or because of defect in the material, the buyer has the right to repair or replace the broken part in order to make the axle operative and perform the functions for which it was designed. Similarly, if one of the parts is made of defective or soft material and wears out, the other parts of the combination being capable of performing their normal and expected functions, the right to replace the worn-out part exists, it seems to us, quite as definitely as in the case of breakage. These rights the appellee confers upon the purchaser by the unconditional sale of the device, and the purchaser having them may employ such services as he wishes to put them into effect. The correct rule is stated, we think, in Wilson v. Simpson, 9 How. 109, 122, 123, 13 L.Ed. 66, as follows: 'In either case, repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a replacement of an essential part of a combination. It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine; and when he repairs the damages which may be done to it, it is no more than the exercise of that right of care which every one may use to give duration to that which he owns, or has a right to use as a whole.' See, also, Shickle, Harrison & Howard I. Co. v. St. Louis Car-Coupler Co. (C.C.A.) [8 Cir.], 77 F. 739, 740.

"The rule as stated in these cases does not, of course, include replacement of all parts of a combination which may be concurrently broken or exhausted by wear. To permit such replacement would be to permit reconstruction. The right, in our view, must depend in every case upon the special facts of the case as they show the relation of the two classes of parts—those supplied and those remaining in the original construction—to the patented unit. It is not to be decided upon a reasonably expected effective operation of the combination as a whole, the so-called activity or passivity of the parts, or upon convenience or necessities of method in making the replacements. Thus, if the new parts so dominate the structural substance of the whole as to justify the conclusion that it has been made anew, there is a rebuilding or reconstruction; and conversely, where the original parts, after replacement, are so large a part of the whole structural substance as to preponderate over the new, there has not been a reconstruction but only repair. This view is not inconsistent with Foglesong Mach. Co. v. J. D. Randall Co., 239 F. 893 (C.C.A.6), relied upon by the appellant, or Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805, upon which appellee relies. Its application to the facts in those cases would result, in our opinion, in the conclusions there reached. Every case, as we have said, must be decided on its special facts and circumstances. For example, there might be a structure where the putting in of a certain number of new parts would be 'reconstruction,' whereas the putting in of a smaller number would be 'repair,' or even where the putting in of one new part would be reconstruction but the putting in of two or three would not be, depending in each case upon whether, after the replacement, the structure as a whole could reasonably be said to be a new structure or the old one. The difficulties that are sometimes encountered in arriving at a correct conclusion in such cases do not arise from any vagueness or uncertainty in the rule or test to be applied, but from the necessity of determining which of the two classes of parts, those supplied or the remaining original parts, dominates the structure as a whole. We are not called upon to make that determination here, for there is no evidence of specific replacements and nothing to show the condition of the original parts of any axle in which a replacement was made or how many of the parts the appellant ever sold for use in a single axle."

See also 20 R.C.L. p. 1159, Sec. 41, as follows:

"*Repair or Reconstruction of Patented Article.*—Patented implements of machines sold to be used in the ordinary pursuits of life become the private individual property of the purchasers, and are not longer specifically protected by the patent laws of the state where the implements or machines are owned and used. Sales of the kind may be made by the patentee with or without conditions, as in other cases, but where the sale is absolute, and without any conditions, the rule is well settled that the purchaser may continue to use the implement or machine purchased until it is worn out, or he may repair it or improve upon it as he pleases, in the same manner as if deal-

ing with property of any other kind. Of course, when the substance of a patented article ceases to exist, there can be no right to renew or reconstruct it unless by consent of the patentee; but repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a replacement of an essential part of a combination. It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine; and when he repairs the damages which may be done to it, it is no more than the exercise of that right of care which everyone may use to give duration to that which he owns, or has a right to use as a whole."

And 30 Cyc. 985:

"The purchaser of a patented machine has the right to use it until worn out, and and therefore he may repair it and substitute new parts for old so long as the identity of the machine is not destroyed. He may not, however, reconstruct or rebuild a worn-out machine. No general rule can be laid down by which to determine the line of demarkation between legitimate repairs which a purchaser of a patented machine may rightfully make thereon, and a reconstruction or reproduction which will constitute infringement. Each case must in that regard be decided on its own facts, having reference to the scope and purpose of the invention and the fair and reasonable intention of the parties."

See also Carter Mach. Co. v. Hanes et al., 4 Cir., 78 F. 346, 347 as follows:

"His claim is for the combination in a tobacco flavoring machine of three parts, —a hopper, a flaring drum, and a spraying device within the drum. His claim, then, is for an entirety. He cannot abandon a part, and claim the rest. He must stand by his claim as he has made it. If more or less than the whole of his ingredients are used by another, such party is not an infringer, because he has not used the invention or discovery patented. Schumacher v. Cornell, 96 U.S. 549 [24 L.Ed. 676]. When a patent is for a combination only, none of the separate elements of which the combination is composed are included in the monopoly. Rowell v. Lindsay, 113 U.S. [97] 101, 5 S.Ct. 507 [28 L.Ed. 906]."

Considering the large number of parts of which a complete stoker of either type in suit is composed and the fact that every part is vital to a stoker; that none of the combination patents or claims in suit covers an entire stoker but only lesser and various combinations of parts, and that defendant has not manufactured any complete stoker of either type or any assembly of parts, but has only furnished individual parts; the nature and extent of a railroad's stock-on-hand requirements for normal and necessary repairs or replacement purposes including the necessity not only from the railroad's standpoint but also from that of the public whom the railroad must be ready to serve at all times; the practice of the railroads and of plaintiff with respect to repairs and replacements of parts, and other facts found and hereinbefore set forth, the Court concludes as a matter of law that defendant in supplying the individual parts which were not covered by a per se patent, but instead were unimproved by any of the patents and were old in the art and included in combination claims only, has not been guilty of any contributory infringement of any of the combination patents and claims even if they were held to be valid. In no instance disclosed, save the one of Seaboard Air Line Railway in which the railroad used four parts made by defendant, was there any reconstruction or rebuilding of a stoker by a railroad to such an extent as to justify the conclusion the stoker was made anew or that an old stoker had lost its identity because following replacements in it the new parts so predominated the structural substance as to justify the conclusion that the stoker had been made anew.

Upon presentation a decree in accordance with the foregoing findings and conclusions of law will be entered.